ALBERT B. KAHN and HOWARD L. WILLIAMS,
Plaintiffs,

*vs.*

GENERAL DEVELOPMENT CORPORATION, a corporation of the State of Maryland, BELLANCA CORPORATION, a corporation of the State of Delaware (formerly known as BELLANCA AIRCRAFT CORPORATION), BLUE STAR AIR LINES, INC., a corporation of the State of Delaware, A. L. GURSHA et al.,
Defendants.

*New Castle, July 7, 1960.*

*Henry N. Herndon, Jr.,* of Morris, James, Hitchens & Williams, Wilmington, and *Nathan N. Schildkraut,* Trenton, N. J., for plaintiffs.

*George T. Coulson* of Morris, Nichols, Arsht & Tunnell, Wilmington, and *George N. Craig* of Craig, Summers & O'Hara, Washington, D. C., for defendant, Bellanca Corp.

*Daniel L. Hermann* of Herrman & Duffy, Wilmington, and *Theodore Charnas* and *Hyman Jacobs,* New York City, for individual defendants, Alvin L. Gursha, Elgin L. Shaw, Daisy Shaw Elliott, Daisy L. Ogletree and Sylva L. Ogletree.

*Edmund D. Lyons* of Morris, James, Hitchens & Williams, Wilmington, for defendant, Arthur W. Seiver.

No appearance for other defendants.

SEITZ, Chancellor: Plaintiffs are escrow agents under an agreement dated June 5, 1956, between Bellanca ("Bellanca") and General Development Corporation ("GDC"), hereafter called the "escrow agreement" or "agreement". The terms of the agreement applied to GDC and its depositing stockholders. Bellanca deposited with the plaintiffs 4,000 shares of its common stock. Bellanca was given an option to take the GDC shares in return for the Bellanca shares under certain conditions.

Certain of the depositing stockholders informed the plaintiffs in the period 1957 and thereafter that they should not deliver the GDC stock to Bellanca because Bellanca had not performed its obligations under the agreement. Bellanca purported to exercise the option by letter dated March 2, 1959. Plaintiffs properly filed the present interpleader action joining as defendants the depositing stockholders as well as the corporations involved. Basically, however, this is a dispute between the appearing stockholders ("defendants") and Bellanca.

Paragraph 4 of the agreement extended to Bellanca for a period of five years from May 1, 1956 the option of notifying the plaintiffs that it desired to have the GDC stock delivered to it. If done, the depositing stockholders of GDC were to receive an agreed number of shares of the stock deposited by Bellanca. The following additional paragraphs of the agreement are pertinent to the present dispute:

"8a. Bellanca shall enter into an agreement with Equitable Security Trust Company, under which they shall pledge sufficient collateral to support a line of credit in the amount of $150,000.00. Borrowings under such line of credit shall be used as working capital and be used to pay off a limited portion of GDC's current liabilities.

"b. GDC shall deliver to Bellanca a non-interest demand note in the amount of $150,000.00 and shall further deliver unto Bellanca a second mortgage on its fixed assets and equipment in an amount equal to the market value of the collateral deposited with Equitable Security Trust Company on the date of execution of this agreement, first mortgage not to exceed $93,000.00 principal and interest as of May 1, 1956.

"c. GDC shall deliver unto Bellanca the resignations of all of its officers and directors on the date of execution hereof."

"22. Bellanca agrees that, during the term of this agreement, it will furnish officers and directors for GDC, such as are satisfactory to Equitable Security Trust Company, the Federal Reserve Bank, Philadelphia, Pennsylvania, and the Department of the Navy and only until Bellanca disposes of its interest in GDC, in which event Bellanca agrees to have the new owners bind themselves to comply with the provisions of this paragraph."

Bellanca first claims that it has validly exercised the option and is entitled to the delivery of the GDC shares. The defendants contend that in 1957 Bellanca breached provisions of the agreement concerning the creation of a line of credit and the furnishing of proper officers and thus they should have their GDC shares back.

■ I consider now the crucial issue as to whether Bellanca breached the agreement by failing to fulfill Paragraph 8 of the agreement.

On June 5, 1956, the same date as the escrow agreement, Bellanca entered into a loan agreement with Equitable Security Trust Company ("Equitable") which provided in pertinent part as follows:

"2—Bank hereby extends unto General Development Corporation a revolving line of credit in the ceiling amount of $150,000.00, and Bellanca does guarantee unto Bank all balances which may from time to time be owed Bank as the result of any borrowings under such line of credit and Bellanca does agree that the stock deposited under Paragraph 1 hereinabove has been deposited as collateral security for any such borrowings, and that any other stock deposited under any of the other paragraphs hereof shall be deposited as collateral security for any such borrowings. The liability of Bellanca and its collateral on this guarantee and on all loans made to General Development Corporation hereunder shall be limited to $150,000.00 plus interest. Bank agrees that for the term of this agreement it will, at all times, make available such sums as will be required to bring General Development Corporation's total borrowings hereunder to $150,000.00 on the terms set forth herein.

"3—Bellanca and Bank agree that Bank shall hold at all times, collateral of a market value equal to at least 200% of the balance owed under this line of credit.

"4—In the event General Development Corporation requests to borrow within the ceiling of $150,000.00 provided herein and if the market value on the stock exchange of the collateral in hand will not equal 200% of the balance after such request has been complied with, the Bank shall notify Bellanca in writing of the value of additional collateral required and within five (5) days after such written notice Bellanca shall deliver additional collateral of such value and in such form as shall bring the market value on the stock exchange of the collateral in hand equal to at least 200% of the balance after such request to borrow has been complied with."

The loan agreement was also executed by GDC but for a limited purpose. Defendants argue that the loan agreement differed from the escrow agreement and thus violated the terms under which the GDC stockholders deposited their shares. My conclusion herein does not require me to consider this point.

On June 5, 1956, Equitable lent GDC $50,000 and received from Bellanca 35,000 shares of Automatic Washer stock as collateral. At a meeting of GDC's officers and representatives of Equitable on June 20, 1956 the following is recited in the minutes as having happened:

"Mr. Dawson [of Equitable] advised that Automatic Washer closed at 3½ on June 19, 1956 and that, therefore, there is room for additional borrowings of approximately $11,000.00 under presently posted collateral. Mr. Rothschild [of Bellanca] indicated that additional collateral·may be available. Messrs. Blythe and Rothschild are attempting to clarify the availability of additional collateral. Mr. Deppert stated that there is no immediate need for additional cash since there is room for borrowings of approximately $29,000.00 under the V-loan."

On August 7, 1956, Bellanca sent to Equitable 75,000 shares of Automatic Washer to be held "on loans made or possibly to be made to General Development Corporation per our agreement". At the same time Equitable was advised that an additional 12,020 shares would be delivered by Mr. Baldini. This took place. On August 24, 1956, Equitable lent GDC an addtional $10,000 and on September 11, 1956, another $10,000.

On September 13, 1956, Equitable, at Bellanca's request, sent all the deposited collateral to a Trenton bank to be held for Bellanca's account against a sight draft for $70,000. Defendants say this breached the agreement but I pass over the point. The shares were returned to Equitable and on October 2, 1956, Bellanca repaid Equitable $20,000. Thereafter Equitable sold 63,400 shares of Automatic Washer to liquidate the balance due. The remaining shares were delivered to Bellanca.

The October 17, 1956 minutes of GDC's board state as follows:

"The subject of the Bellanca loan was brought up and it was reported that the security for this loan, the Automatic Washer Stock, had been returned to the bank. Mr. Blythe [president of GDC] suggested that under the loan agreement Equitable Security Trust Company would be required to advance funds up to $150,000.00 providing the collateral meets the terms of the loan

agreement. Mr. Rothschild informed the group that their company is working on the problem of disposing of the Automatic Washer Stock and if this event occurs Bellanca will advance cash instead of collateral. Mr. Rothschild offered to deposit additional shares of Automatic Washer Stock if required by the bank."

Mr. Rothschild, representing Bellanca, testified that Equitable's agent indicated that it did not want any Automatic Washer stock as collateral. In any event, it appears to have been made clear by Bellanca that rather than supplying collateral to Equitable it would handle GDC's financing directly. Indeed, a reasonable inference is that Bellanca did not have sufficient collateral to support later substantial borrowings from Equitable. The Equitable agreement was never explicitly cancelled. I think that as a practical matter it was not available in implementation of the terms of the escrow agreement after sometime in the fall of 1956.

In the fall of 1956, Bellanca advanced to General Development Corporation in three installments a total of $20,000. Thus, at that date Bellanca's outlay for GDC was $90,000. At this point GDC and Bellanca had in effect changed the escrow agreement to the extent that Bellanca was to supply loans directly. In 1957 an executive committee took control. GDC's financial man on the committee was Deppert while Bellanca's representative was Baldini. While there were others, Deppert and Baldini dealt primarily with the operations under the escrow agreement.

It appears to be conceded that the defendants never explicitly agreed to the modification of the escrow agreement in 1956 to permit Bellanca to advance the money directly rather than through bank loans. However, let us assume that this change as such was not detrimental to the defendants and thus would not warrant rescission. Was the modified arrangement or novation honored by Bellanca? My inference from the record is that after advancing $20,000 directly, Bellanca, through its representative on the GDC board, Baldini, in practical effect refused to lend money to GDC at various times in 1957 when it needed or could have used additional working capital. In some instances he caused loans to be obtained for GDC under the

V-loan program. Thus, it was obtaining interest bearing loans at a time when an interest free line of credit was presumably available from Bellanca.

This was not an arms-length situation at the time the need for additional working capital arose. Bellanca was in control of GDC and "their" man Baldini had the responsibility with respect to raising funds for GDC. Moreover, he had the power to draw on Bellanca's funds, assuming they were available in 1957, for the use of GDC. It is true that Bellanca's control of GDC was visualized by the terms of the escrow agreement. Nevertheless, GDC's stockholders were entitled to have GDC receive the benefits they had bargained for when they agreed to deliver their shares. Did Bellanca provide the agreed consideration under the circumstances of this case?

Mr. Deppert, who was not a "Bellanca" man on the GDC board, was a "careful" witness. He testified of repeated indications by him to Baldini of "need" for working capital. He hesitated to describe them as demands, but in their context I think they must be considered at least as requests. His restraint had significance because in my opinion it in effect understated what happened. I think his testimony, when read in conjunction with the Pincus testimony (GDC's purchasing agent), reasonably warrants the conclusion that in 1957 Bellanca in effect refused to lend GDC working capital under the escrow agreement. Indeed, Baldini's testimony adds support to this conclusion. And further support is found in the testimony of Mr. Rothschild, an executive of Bellanca.

It is questionable whether, under the terms of the escrow agreement, GDC's stockholders must show resulting injury in order to have the court grant rescission. I say this because of the terms of agreement. They did their part but Bellanca only partially performed. In any event, there were injuries resulting from the refusal by Bellanca to advance additional working capital. Deppert, with characteristic restraint, testified that the lack of working capital resulted in the "normal disadvantages". He knew because he was in charge, inter alia, of GDC's procurement and cost control. The evidence also showed that some suppliers place more stringent credit restrictions

on GDC because of its lack of sufficient funds to meet obligations promptly. I say this with a full realization that some such restrictions were not attributable to this situation. It is true that the injury is difficult to translate into recoverable damages but that does not mean that it did not occur.

Bellanca points out how much better Baldini managed GDC. I do not consider that to be the issue.

Bellanca next argues that Bellanca's exercise of its option was a condition subsequent which extinguished its liability, if any, to defendants. To adopt this argument would be to permit Bellanca to breach its part of the agreement and yet continue the vitality of the option. Such a result would permit Bellanca to speculate on the future of GDC without fully discharging its contract responsibility. It must be remembered that GDC's obligation to pay back the money advanced by Bellanca continued, albeit without interest, whether or not Bellanca exercised its option.

Whatever situations may be covered by Section 396 of the Restatement of Contracts, involving conditions subsequent, I am satisfied that it does not embrace this case. This is particularly true here where the defendants invoked the breach at about the time it occurred, while the attempted exercise was about two years later. The defendants cannot be held responsible for the delay in instituting this action. Defendants' actions both in dealing with the escrow agents and before the court were timely.

Bellanca, in dealing in effect with itself, took a calculated risk in the first place in deviating from the escrow agreement without obtaining the approval of the GDC stockholders. It compounded this risk when it refused to advance additional working capital in the face of what I have found to be repeated requests therefor under the escrow agreement. Bellanca cannot point to any evidence that the GDC stockholders agreed to this procedure.

In view of the fact that Bellanca was "running" GDC, the principle dealing with the propriety of substituting the court's judgment for that of GDC's directors is of no particular pertinency here. Moreover, Baldini was also an officer and director of Bellanca at the time.

I conclude that defendants are entitled to the return of their disputed stock but on conditions which equity may impose in granting rescission. I shall hear counsel as to the disposition of the stock of the non-appearing defendants. I believe that by appropriate mechanics GDC should give Bellanca reasonable guarantees with respect to the sums advanced and which have not been repaid. Also, Bellanca should be reimbursed for any interest actually paid. Additionally, Bellanca should receive interest on the interest and principal paid to or for the benefit of GDC. If the parties cannot agree on the rate thereof the court will fix it after hearing the parties.

██ I come now to the defendants' derivative action against Bellanca. It is based on the alleged damage resulting from Bellanca's breach of the agreement.

The escrow agreement leaves something to be desired in the way of particularity. Thus, it seems to the court that it might well be argued that, in view of the option provision, Bellanca's failure to provide the line of credit merely meant that Bellanca forfeited its option right. But even if the derivative action is maintainable despite the objections raised, the fact is that defendants' proof of damages was inadequate. The claim that the management borrowed on the V-loan and paid interest rather than under the interest free escrow agreement was not developed with the particularity which would permit the court to assess damages.

I conclude that defendants are not entitled to relief on their derivative claim.

Present order on notice.